CLERKS OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED
DEC 4 2018
JULIA C. DUDLEY, CLERK
BY: s/ MARTHA L. HUPP
      DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Danville Division

| | |
|---|---|
| ELSIE L., on behalf of J.D.W., a minor child, | ) ) |
| Plaintiff, | ) Civil Action No. 4:17-cv-00050 |
| v. | ) |
| | ) REPORT & RECOMMENDATION |
| NANCY A. BERRYHILL, | ) |
| Acting Commissioner of | ) By:   Joel C. Hoppe |
| Social Security, | )         United States Magistrate Judge |
| Defendant. | ) |

Plaintiff Elsie L., on behalf of her minor daughter J.D.W., asks this Court to review the Acting Commissioner of Social Security's ("Commissioner") final decision denying J.D.W.'s application for supplemental security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381–1383f. The case is before me by referral under 28 U.S.C. § 636(b)(1)(B). ECF No. 12. Having considered the administrative record, the parties' briefs, and the applicable law, I cannot find that substantial evidence supports the Commissioner's denial of benefits. Accordingly, I recommend that the presiding District Judge reverse the decision and remand the matter for further proceedings.

## I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final decision that a person is not entitled to disability benefits. 42 U.S.C. §§ 405(g), 1383(c)(3); *see also Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, a court reviewing the merits of the Commissioner's final decision asks only whether the Administrative Law Judge ("ALJ") applied the correct legal standards and whether

substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 98–100 (1991)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review takes into account the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam) (quoting *Craig v. Chater*, 76 F.3d 585, 594 (4th Cir. 1996)). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

## II. Legal Framework

A child is "disabled" within the meaning of the Act if he or she "has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i). Social Security ALJs follow a three-step process to determine in the first instance whether a child claimant is disabled. The ALJ asks, in sequence, whether the child: (1) is working; (2) has a severe medically determinable impairment; and, if so, (3) has an impairment or combination of

impairments that meets, medically equals, or functionally equals any of the disabling childhood impairments listed in the Act's regulations. *See* 20 C.F.R. § 416.924 (2015).[1] At step three, if the ALJ finds that the child's severe impairment or combination of impairments does not meet or medically equal a specific listed impairment, then the ALJ must determine whether the severe impairment functionally equals a listing by evaluating how the child performs in "six domains of functioning" compared to children the same age "who do not have impairments." *Id.* § 416.926a(b). The six domains are: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for himself or herself; and (6) overall health and physical well-being. *Id.* § 416.926a(b)(1). To "functionally equal" the listings, the child's severe medical impairment(s) must cause "marked limitations" in two domains or an "extreme limitation" in one domain.[2] *Id.* § 416.926a(d). The claimant bears the burden of proving that he or she is disabled. *See S.R. ex rel. R.R. v. Barnhart*, 371 F. Supp. 2d 796, 799 (W.D. Va. 2005).

### III. Procedural History

In March 2013, Elsie L. filed the underlying SSI application alleging that eight-year-old J.D.W. was disabled by attention deficit hyperactivity disorder ("ADHD"), autism, and a learning disorder. *See* Administrative Record ("R.") 515–16, 597–603, ECF No. 9. Disability

---

[1] Unless otherwise noted, citations to the Code of Federal Regulations refer to the version in effect when ALJ Munday issued her written decision on December 24, 2015.

[2] The child's functioning may be sufficiently limited when his or her "impairment(s) limits only one activity or when the interactive and cumulative effects of [the] impairment(s) limit several activities" within a functional domain. 20 C.F.R. § 416.926a(e)(2), (3). A "marked limitation" means the "impairment(s) interferes seriously" with the child's "ability to independently initiate, sustain, or complete activities." *Id.* § 416.926a(e)(2); *see also id.* ("'Marked' limitation also means a limitation that is 'more than moderate' but 'less than extreme.'"). An "extreme limitation" means the "impairment(s) interferes very seriously with [the] ability to independently initiate, sustain, or complete activities." *Id.* § 416.926a(e)(3); *see also id.* ("'Extreme' limitation also means a limitation that is 'more than marked.'"). Although the "extreme limitation" rating is reserved for "the worst limitations," this "does not necessarily mean" that the child must demonstrate "a total lack or loss of ability to function" in a particular domain. *Id.*

Determination Services ("DDS"), the state agency, denied the claim initially in May 2013, R. 514–24, and upon reconsideration in February 2014, R. 525–38. On October 20, 2015, Elsie L. and J.D.W. appeared with counsel at an administrative hearing before ALJ H. Munday. *See* R. 65–85. Elsie L. testified about J.D.W.'s impairments and related functional limitations, R. 74–83, and J.D.W. described her favorite activities and subjects in school, R. 70–73.

ALJ Munday issued an unfavorable decision on December 24, 2015. R. 43–59. She found that J.D.W.'s obesity, ADHD, and autism were "severe" medically determinable impairments, R. 46, but that they did not meet or medically equal the corresponding childhood listings, R. 47. ALJ Munday then evaluated J.D.W.'s impairment-related functional limitations in each of the six domains. *See* R. 48–58. She found that J.D.W. had "no limitation" in the domains of (i) acquiring and using information, and (ii) overall health and physical well-being and "less than marked limitation" in the domains of (iii) attending and completing tasks, (iv) interacting and relating with others, (v) moving about and manipulating objects, and (vi) caring for herself. *See* R. 50–58. Based on these findings, ALJ Munday concluded that J.D.W.'s impairments did not "functionally equal[] the severity of the listings," R. 48, because they did not "result in either 'marked' limitations in two domains of functioning or [an] 'extreme' limitation in one domain of functioning," R. 58. Therefore, J.D.W. was not disabled during the relevant time.

Elsie L. then asked the Appeals Council to review ALJ Munday's decision. She also submitted nearly 500 pages of additional educational and medical-source evidence created between October 2009 and February 2016. R. 2; *see generally* R. 13–39, 88–509. The Appeals Council accepted most of this evidence, but found that it did "not show a reasonable probability that it would change the outcome of the [ALJ's] decision" denying J.D.W.'s claim; therefore, the Appeals Council "did not consider and exhibit [that] evidence." R. 2 (citing R. 87–114, 115–

4

509); *see* R. 8–9; 20 C.F.R. § 416.1470(a)(5), (c) (2017). The Appeals Council rejected two other records from March and February 2016, because it found that this "additional evidence [did] not relate to the period at issue" in ALJ Munday's December 2015 decision.[3] R. 2 (citing R. 13–35, 36–39); *see also* Def.'s Br. 14–15, ECF No. 19; 20 C.F.R. § 416.1470(c) (2017). The Appeals Council denied Elsie L.'s request to review that decision, R. 1–4, and this appeal followed.

IV. Discussion

Elsie L. primarily argues that ALJ Munday did not adequately explain how she weighed conflicting evidence about J.D.W.'s severe autism and the extent to which the impairment and

---

[3] Nonetheless, the Commissioner included all of this additional evidence in the "copy of the transcript of the record" filed with this Court, 42 U.S.C. § 405(g), and certified that the documents contained therein "constitute a full and accurate transcript of the entire record of proceedings relating to this case," Certification, ECF No. 9-1, at 1. *See* R. 13–35, 36–39, 87–114, 115–509; 42 U.S.C. § 405(g) ("[T]he Commissioner . . . shall file a certified copy of the transcript of the record including the evidence upon which the findings and decision complained of are based."). Even more confounding, most of the additional evidence appears *after* ALJ Munday's written decision and the transcript of testimony given at the administrative hearing, R. 43–59, 66–86, both of which in the usual course are part of "the transcript of the record" the Court must consider at this stage of the proceedings, 42 U.S.C. § 405(g). The Commissioner's decision to mix into the certified copy of the record evidence that her agency has expressly refused to "consider and exhibit," R. 2, presents an awkward procedural posture for judicial review. *See Wooding v. Comm'r of Soc. Sec.*, No. 4:10cv6, 2010 WL 4261268, at *2–6 (W.D. Va. Oct. 29, 2010) (Kiser, J.) (explaining the differences in the court's statutory authority to review the Commissioner's final decision under sentence four versus sentence six of 42 U.S.C. § 405(g) (citing *Wilkins v. Sec'y, Dep't of Health & Human Servs.*, 953 F.2d 93 (4th Cir. 1991) (en banc)); *cf. Daley v. Comm'r, Soc. Sec.*, No. 18-1455, 2018 WL 6016551, at *1–2 (4th Cir. Nov. 16, 2018) (per curiam) (noting the "significant and material differences between" sentence four and sentence six, including the permissible scope of judicial review under each sentence, and vacating district court's order where the panel could not determine which sentence the district court had relied upon in remanding the case).

In a different case, I might now have to choose which part of § 405(g)'s text—sentence four or sentence six—governs this Court's authority to review the Commissioner's final decision and to dispose of the action. *See Daley*, 2018 WL 6016551, at *1–2. The parties' briefs do not address this important question. Nevertheless, because I find that the ALJ's analysis of the *original* record was so facially deficient that "the reviewing court has no way of evaluating the basis for the ALJ's decision," *Radford v. Colvin*, 734 F.3d 288, 295 (4th Cir. 2013), I need not resolve this question today. Should the decision be reversed and the case remanded under sentence four, as I recommend, the Commissioner will have the opportunity to consider any issues presented by this additional evidence. *See* 20 C.F.R. § 416.1483 (2018). In the future, the Court welcomes the parties' input on how best to proceed under § 405(g) when the Commissioner files a certified transcript of the record of the underlying administrative proceedings that contains evidence the Commissioner, through the Appeals Council, has explicitly declined to accept, consider, and/or incorporate into that record.

related symptoms limited the child's abilities to interact and relate with others and to care for herself at an age appropriate level. *See generally* Pl.'s Br. 4–7, ECF No. 16. The regulations set out a two-step process for ALJs to evaluate a claimant's symptoms.[4] *Lewis v. Berryhill*, 858 F.3d 858, 865–66 (4th Cir. 2017); 20 C.F.R. § 416.929. "First, the ALJ looks for objective medical evidence showing a condition that could reasonably produce the alleged symptoms." *Lewis*, 858 F.3d at 866. Second, assuming the claimant clears the first step, "the ALJ must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's ability" to work, *id.*, or if the claimant is a child, to function at an age-appropriate level, 20 C.F.R. § 416.929(c). "The second determination requires the ALJ to assess the credibility of the claimant's statements about symptoms and their functional effects," *Lewis*, 858 F.3d at 866, based on all the relevant evidence in the record. 20 C.F.R. §§ 416.924a, 416.926a, 416.929(c)(3). The ALJ must give specific, legally adequate reasons supported by "references to the evidence" for the weight assigned to the claimant's description of her medical condition. *Edwards v. Colvin*, No. 4:13cv1, 2013 WL 5720337, at *6 (W.D. Va. Oct. 21, 2013); *see also Bishop v. Comm'r of Soc. Sec.*, 583 F. App'x 65, 68 (4th Cir. 2014) (per curiam) (citing *Eldeco, Inc. v. NLRB*, 132 F.3d 1007, 1011 (4th Cir. 1997)). And, although the reviewing court will defer to an ALJ's adverse credibility determination absent "exceptional circumstances," *Bishop*, 583 F. App'x at 68, her written decision must at least "build an accurate and logical bridge from the evidence to [her] conclusion" that the claimant's statements were not credible,

---

[4] Symptoms are the claimant's "own description of [his or her] physical or mental impairment." 20 C.F.R. § 416.928(a). "If the claimant is a child who does not describe, or cannot adequately describe, his [or her] symptoms the ALJ will accept as a statement of [the child's] symptom(s) the description given by the person who is most familiar with [the child], such as a parent, other relative, or guardian." *Gerette v. Colvin*, No. 7:15cv12, 2016 WL 1254611, at *8 (W.D. Va. Feb. 2, 2016) (internal quotation marks omitted), *adopted by* 2016 WL 1296082 (W.D. Va. Mar. 30, 2016). The ALJ must follow the same two-step process to evaluate the caregiver's testimony about the child's medical condition, just as he would if the child claimant were testifying. *See id.*

*Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016) (quotation marks omitted).

ALJ Munday discussed Elsie L.'s testimony and some of her other subjective statements in her summary of the lay evidence and again as part of the functional-equivalence assessment. *See* R. 49–57. She found that J.D.W.'s severe autism could reasonably be expected to cause the child's alleged symptoms, but that Elsie L.'s statements describing the essentially disabling intensity, persistence, or functionally limiting effects of those symptoms were "not entirely credible for the reasons explained" later in her decision. R. 49. Rather than articulate any *specific* reasons for discounting Elsie L.'s statements, however, ALJ Munday appears to have simply "summarized the evidence that [she] found credible, useful, and consistent," *Woods v. Berryhill*, 888 F.3d 686, 695 (4th Cir. 2018), with her own conclusion that J.D.W. had at most "less than marked" limitations in each of the six functional domains, *see* R. 49–58. Without some explanation of why ALJ Munday discounted—if not outright rejected—aspects of Elsie L.'s testimony and other subjective statements describing J.D.W.'s autism, I cannot conclude that her functional equivalence assessment is both legally adequate and supported by substantial evidence in the original record.

"The missing analysis is especially troubling" as it relates to J.D.W.'s limited ability to interact and relate with other people "because the record contains conflicting evidence . . . that the ALJ did not address." *Mascio v. Colvin*, 780 F.3d 632, 637 (4th Cir. 2015). The "Interacting and Relating with Others" domain considers how well a child develops and uses verbal and nonverbal language to communicate with members of his or her community; cooperates and shares with others; initiates and sustains emotional connections with adults and other children; complies with rules, including conventional "social rules for interaction and conversation"; reacts to criticism or discipline; considers other people's feelings and diverse perspectives;

7

respects other people's possessions; and responds to emotional and behavioral cues. 20 C.F.R. § 416.926a(i)(1). "Interacting and relating with others [involves] . . . all aspects of social interaction at home, at school, and in the community." R. 53; *see also* 20 C.F.R. § 416.926a(i). The regulations list six examples of limitations that a child might have in this particular domain, such as having "no close friends" or having friends that are "all older or younger" than the child and being "overly anxious or fearful of meeting new people or trying new experiences."[5] 20 C.F.R. § 416.926a(i)(3)(ii)–(iii). Because "the examples do not necessarily describe a 'marked' or 'extreme' limitation," however, the ALJ must "consider all of the relevant information in [the] case record" when evaluating the nature and severity of the child's impairment-related functional limitations. *Id.* § 416.926a(i)(3).

Elsie L. alleges that J.D.W. is disabled by autism that significantly limits the child's ability to interact with other people at an age-appropriate level whether at home, in school, or in her community. In February 2012, J.D.W.'s kindergarten teacher completed a Behavior Assessment Scale for Children indicating that the five-year-old exhibited "significant emotional, social adaptive, or behavioral problems in the school setting." *See* R. 914. She "often" worried and had trouble making new friends and "almost always . . . argue[d] when denied her own way." *See id.* On March 8, Elsie L. told J.D.W.'s treating psychiatrist that the child exhibited "increased irritability, frustration, more difficulty with social interactions, and ha[d] become less patient" during the day. R. 796. Sharmini Santher, M.D., observed that J.D.W. was "slightly unkempt" (because she did not like her hair touched) and appeared "more irritable" and "less

---

[5] The six examples are: (i) the child does "not reach out to be picked up and held" by his or her caregiver; (ii) the child has "no close friends" or any friends are "all older or younger" than the child; (iii) the child avoids or withdraws from people he or she knows or is "overly anxious or fearful of meeting new people or trying new experiences"; (iv) the child has "difficulty playing games or sports with rules"; (v) the child has psychological or emotional "difficulty communicating with others" using "verbal or nonverbal" expression or carrying on a conversation; and (vi) the child has physical "difficulty speaking intelligibly or with adequate fluency." *See* 20 C.F.R. § 416.926a(i)(3).

8

engaged" than on prior visits. R. 797. Her speech was "louder," "clearer, and more coherent," but her mood was "irritable/bored." *Id.* J.D.W. also exhibited "limited" insight and judgment and "poor frustration tolerance." *Id.* On June 21, Elsie L. reported that J.D.W. was "much better overall since school was let out for the summer." R. 790. Dr. Santher observed that J.D.W. was "more pleasant" on this visit, but she still appeared "irritable/bored" and had "limited" insight and judgment. R. 791. Her speech was fast and "somewhat garbled," which was "unchanged" from prior visits. *Id.* On August 27, Elsie L. reported that she did not take J.D.W. shopping with her because the child worried excessively and did not like crowds. R. 786. Psychiatrist Kimberly Papa, M.D., observed that J.D.W. was well dressed, but had unkempt hair and poor hygiene. R. 787. She was pleasant and tried to cooperate with Dr. Papa's evaluation, but she was easily distracted and became more irritable and restless as the ten-minute visit progressed. *See* R. 787–88. Dr. Papa could not fully evaluate J.D.W.'s thought processes or content because the child showed "limited" engagement and did not communicate for most of the meeting. R. 788. She had a restricted affect, but was "brighter" and spoke loudly when "passionate" about a subject. *See* R. 786–88. J.D.W.'s mood, affect, speech, and social interaction were notably improved at visits in October and December 2012. *See* R. 781, 784–85.

In January 2013, seven-year-old J.D.W. was referred to Pasquale Accardo, M.D., for a developmental pediatrics assessment. R. 750–53. She had an Individualized Education Program ("IEP") for autism and speech-language impairment and was currently repeating the first grade in a self-contained classroom with five other students at Bacon District Elementary School. R. 750; *see* R. 786. Elsie L. explained that J.D.W. sometimes laughed inappropriately, was loud, impulsive, easily frustrated, overly friendly, immature, and got along better with much younger children than she did with kids her own age. *See* R. 750–52. She did "not show common sense or

9

empathy." R. 752. Conversations were terse and literal, and she did not understand jokes. R. 751. J.D.W. threw brief tantrums that involved "screaming, banging, slamming, hitting, and throwing things." R. 752. The tantrums had "obvious triggers" and did not occur every day, but J.D.W. could "be explosive and aggressive apart from the tantrums." *Id.*

On January 8, Elsie L. told Dr. Papa that J.D.W. was "fantastic" as long as she did not have to go to school. R. 777. She did not like gym class because other children mocked her. *Id.* On examination, J.D.W.'s mental status was generally unremarkable, although her speech was still "loud when passionate and garbled sometimes." R. 778. On March 12, Elsie L. told Dr. Papa that J.D.W. was "usually bubbly," but was still "throwing tantrums when she doesn't get her way or is told no." R. 774. She routinely hit her younger sister, *id.*; *see also* R. 777, 958, and she had shaken her bed so aggressively that it broke, R. 774. The tantrums occurred once a week at home (never at school) and were getting worse as J.D.W. grew older. R. 774. Findings on mental status examination were unchanged from the prior visit. *Id.* On June 4, Elsie L. reported that J.D.W. was "having the worst fits she has ever seen when she doesn't get her way." R. 958. Since their last visit in March, J.D.W. had "gotten so mad she pulled [a] bedroom door off [the] wall and punched a hole in [a] bathroom wall." *Id.* The child "also refuse[d] to leave the house, 'her comfort zone,' and [would] scream [and] yell." *Id.* On examination, J.D.W. did "not identify her mood" and she "shrug[ged]" when Dr. Papa asked her about "wanting to hurt others." R. 959. She exhibited a "labile [and] anxious affect" and "brief loud speech." *Id.* J.D.W.'s mood and communication improved by her next visit with Dr. Papa on July 11. R. 957.

On September 5, 2013, Elsie L. reported that J.D.W. had increasingly severe anxiety whenever she was not at home, and especially when she went out in public. R. 1011; *see* R. 1020. She still threw "fits" at home. R. 1011. A neurological examination revealed normal motor

10

function and speech, but was otherwise "limited by fearfulness[,] anxiety," and J.D.W.'s repeated demands to go home. R. 1020. Syndi Seinfeld, D.O., noted "abnormal involuntary movements" causing some "concern for seizures" and a possible "tic disorder." *Id.* Dr. Seinfeld and Elsie L. agreed to monitor J.D.W. given that the involuntary movements had decreased since she stopped taking one of her anti-anxiety medications. *Id.* Later that day, psychiatrist Aradhana Sood, M.D., observed that J.D.W. was "anxious" and "less cooperative than usual," and she eventually left the office on her own after demanding to go home. *See* R. 1011. Dr. Sood prescribed Celexa for depression and anxiety despite the risk of increased aggression as possible side effect. R. 1012. J.D.W.'s anxiety had improved at her next visit with Dr. Papa on October 10. R. 1000. She had a best friend at school named Diamond, and she recently won a ribbon for playing soccer in the Special Olympics. *Id.* Elsie L. denied medication side effects, expressed that "the celexa has been 'wonderful,'" and agreed that the child was doing better overall. *Id.* On December 5, Elsie L. told Dr. Sood that J.D.W.'s grades had improved, but "her social skills ha[d] not yet been addressed." R. 971. As an example, she noted that J.D.W. "got in trouble once for mimicking a grown up at school." *Id.* On examination, Dr. Sood observed that J.D.W. was "hitting," but otherwise was "calm" and had a good mood and full affect. R. 972. She spoke loudly and interrupted, but "accept[ed] redirection well." *Id.* Dr. Sood agreed that Elsie L. should pursue additional autistic-specific services for J.D.W. *Id.*

The next psychiatric progress note in the original record is dated March 2, 2015. *See* R. 1080–81. Nine-year-old J.D.W. told Guinit Kaur, M.D., that "school and home [were] going well, except for some boys in class [were] mean to her." R. 1080. Elsie L. reported that J.D.W. was doing well overall and "her current medication regimen seem[ed] to be working well" without causing any side effects. *Id.* J.D.W. "struggle[d] a bit in her special education class

because cognitively she function[ed] higher and the class [was] primarily [made up of] boys who tease her." *Id.* She also continued "to work with a [Therapeutic Day Treatment ("TDT")] counselor at school." R. 1081. On examination, Dr. Kaur observed that J.D.W. was "calm, alert, and oriented to conversation, . . . cooperative, bright, and friendly [with] fair eye contact" and "fair" insight and judgment. *Id.* She had a "'nice' mood [and] appropriate affect." *Id.* On April 17, Elsie L. spoke to Dr. Kaur about school officials' insistence that J.D.W. be placed in all general-education classes because she had been so successful in a self-contained environment. R. 1122. Elsie L. noted that they had tried to put J.D.W. in general classes before, but she experienced "seizure like symptoms due to her anxiety." *Id.* Dr. Kaur asked Elsie L. to talk to J.D.W.'s teachers and find out why they wanted to make this change in the middle of the school year. *Id.* She also noted the clinic could provide a letter explaining why "this [was] not the best option" for the child. *Id.*

    J.D.W. primarily attended classes in a "self contained classroom" with a few other students who also received special-education services because an "inclusive" general-education classroom "overwhelm[ed]" her and provided "too much stimulation." *See* R. 872, 873, 877. In March 2013, J.D.W.'s parents reported "improvement in her attitude for school since she's been in a smaller class setting," but they were still "fearful of other children teasing and mistreating" her. R. 864. J.D.W.'s teachers described her as "very friendly, polite, and talkative." R. 865. Sometimes she became "frustrated, but no tantrums ha[d] been observed when [she was] upset," and the teacher could "talk[] her down" when she began to get upset. *Id.* She liked her classmates and tried to interact with them, but sometimes she mistook their laughter as being directed at her. *Id.* Nancy Worner, J.D.W.'s special-education teacher, opined that compared to other children her age who did not have impairments, J.D.W. had "slight" problems playing with other

children, making and keeping friends, expressing anger appropriately, and following rules. R. 692. In January 2014, Ms. Worner opined that J.D.W. had "no problems" interacting and relating with others at an age-appropriate level. R. 662.

J.D.W.'s IEP from March 2015 indicates that she "express[ed] her wants, needs, and desires without any problems" and was "friendly with all of her classmates." R. 703. Elsie L. was still "fearful of other children teasing and mistreating" her, R. 702, but teachers noted that J.D.W. was pleasant and played well with students, R. 704. School personnel wanted J.D.W. to transition to a general-education classroom for fourth grade, but Elsie L. wanted her "to be more comfortable around a larger class size" first. R. 703. They would start by keeping J.D.W. in a special-education classroom for core academic subjects and placing her "with the general education class for PE, Art, Music, and Library." *Id.* J.D.W.'s IEP was revised in late September 2015 such that J.D.W. would "be in the general education classroom for Math & Reaching and in the instructional support classroom for all other academic subjects." R. 719. This change was made because J.D.W. was displaying increased anxiety at home. R. 719–21; *see* R. 1228 ("Mother states that [J.D.W.] has meltdowns when she gets home from school because she is so stressed. School personnel are unwavering about her placement.").

J.D.W. also worked with a TDT counselor at school. *See* R. 703, 1062–68. Between August 2014 and February 2015, the counselor helped J.D.W. learn how to "identify her feelings" and "age appropriate social skills" and to describe how people and stressful situations affected her physically. R. 1062–63. A comprehensive treatment plan dated August 20, 2015, indicates J.D.W. "demonstrate[d] dangerous behavior" that might put her or others at risk of harm. R. 1067. The TDT counselor intended to teach J.D.W. how to "use anger management skills when feeling [like she was] about to explode" or to ask for help when she felt suicidal. *Id.*

J.D.W. also needed to keep working on "strategies and techniques that will help her interact and communicate in a positive appropriate manner with her peers and teachers," including social greetings and not bottling up her emotions until she gets home at the end of the day. R. 1062–63.

At the administrative hearing in October 2015, ten-year-old J.D.W. testified that she had trouble making friends. R. 72. "There was only one friend," a girl named Crystal, but she moved away, and J.D.W. never saw her again. *Id.* She brought her teddy bear and baby blanket with her to the hearing. Elsie L. confirmed that J.D.W. "doesn't get along with children her own age. When she does play with children she wants to play with" preschoolers. R. 75. J.D.W.'s "best friends" were a blanket and teddy bear that she received in the hospital when she was born. R. 77. Her classmates "tease[d] her because she [was] not doing the age-appropriate thing[s]," and she had a TDT counselor with her during the day because she has "meltdowns . . . in school." R. 76. The school had informed Elsie L. that J.D.W. "doesn't have any friends," R. 78, and had been observed "licking things" inappropriately, R. 80. About a week before the hearing, school officials sent home a disciplinary warning after J.D.W. wrote on the board that "she would like to kill the kids that are bullies." R. 78.

\* \* \*

ALJ Munday concluded that J.D.W.'s severe autism affected her ability to interact with other people, but that she had "only a less than marked limitation" in this functional domain. R. 54. She initially based this conclusion on the DDS psychologists' opinions from May 2013 and February 2014, *see* R. 520, 533–34, which she found to be "supported by [J.D.W.'s] mental health and school records," R. 53. ALJ Munday acknowledged Elsie L.'s testimony that her daughter had "meltdowns," was "very immature," got teased by other children "because she [was] not age-appropriate," had "no friends in school," and still carried a stuffed animal and

baby blanket with her. R. 49 (citing R. 76–77). She did not mention J.D.W.'s testimony that her one and only friend had moved away, R. 72, or her mother's consistent reports that J.D.W. only played with children who were much younger than her, *see*, *e.g.*, R. 75, 750–52. ALJ Munday also summarized Elsie L.'s March 2013 report to Dr. Papa that J.D.W. fought with her sister and had "tantrums one time a week when she does not get her way" at home, as well as her June 2013 report that J.D.W. "got so mad that she pulled off her bedroom door and punched a hole in the bathroom wall." R. 54 (citing R. 774, 958).

      ALJ Munday then found that, "[d]espite these issues," mental status "examinations indicate that [J.D.W.] is friendly, has a happy mood, has a bright affect, and has no evidence of psychosis." *Id.* (citing Ex. 10F). More "recent notes from 2015 indicate[d] that the [child was] doing well at home and at school, as her current medication regimen [was] 'working well.'" *Id.* (citing Ex. 20F). The same set of progress notes, R. 1070–215, showed that J.D.W.

> has only some anxiety at school from mainstreaming her classes and gets teased by some boys. However, her mental status is unremarkable, as she is cooperative, friendly, has fair eye contact, clear speech, [is] talkative, [has a] nice mood, appropriate affect, linear and logical thought processes, no suicidal or homicidal ideations, no psychosis, and fair insight and judgment.

*Id.* (citing Ex. 20F). ALJ Munday did not mention any of the mental status examinations where J.D.W. had a "restricted," R.788, "irritable," R. 787, 794, 797, or labile and anxious affect, R. 959, 1012, 1020; showed poor frustration tolerance and limited engagement or speech, R. 787–88, 794, 797, 917, 972, 1011–12; engaged in "hitting" behavior despite being in a good mood, R. 971; had "limited" insight and judgment, R. 775, 781, 784–85, 788, 791, 794; exhibited "garbled," fast, and "loud" speech, R. 781, 784, 794, 957, 972; and seemed ambivalent to specific concerns that she "want[ed] to hurt others," R. 959. *See Lewis*, 858 F.3d at 869 ("An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherrypick facts that support a finding of nondisability while ignoring evidence that points to a disability

15

finding." (quoting *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010)). She also did not acknowledge that the school's attempt to mainstream J.D.W. during the 2015–2016 academic year caused the child to suffer such severe anxiety (or "meltdowns") that the plan was abandoned in September 2015, when J.D.W. returned to a mostly self-contained learning environment, R. 719–21, 1228. *Cf. Woods*, 888 F.3d at 694 ("An ALJ may not consider the *type* of activities a claimant can perform without also considering the *extent* to which she can perform them.").

ALJ Munday next found that J.D.W. could "play with friends," had a "best friend at school named Diamond," R. 54 (citing Exs. 10F, 12F), and had "not received any disciplinary actions at school," *id.* The latter finding directly contradicts Elsie L.'s testimony that in the fall of 2015 school personnel sent home a disciplinary warning after J.D.W. wrote on the board that "she would like to kill the kids that are bullies." R. 78. ALJ Munday did not mention this testimony, let alone explain why she appears to have rejected it out of hand. *Cf. Hines*, 453 F.3d at 566 ("The deference accorded an ALJ's findings of fact does not mean that we credit even those findings contradicted by undisputed evidence."). Nor did ALJ Munday mention that J.D.W. had an in-school counselor to help her interact appropriately with other people and to control "dangerous behavior" that might put herself or others at risk of harm. R. 1067.

Overall, ALJ Munday concluded that J.D.W. had "less than marked limitation with interacting and relating to others" because, while she had "some behavioral issues at home, she does not demonstrate these issues at school." R. 54. She appeared to base the latter finding on Ms. Worner's teacher questionnaires from 2013–2014 and the March 2015 IEP describing J.D.W. as a friendly child who generally had no trouble interacting or relating with other people. *See id.* (citing Exs. 9E, 13E, 16E). Nowhere, however, did ALJ Munday identify or explain "the reasons" why Elsie L.'s fairly consistent statements describing J.D.W.'s more extreme functional

16

limitations in this domain were "not entirely credible."[6] R. 49. And, as explained, the ALJ's summary of the longitudinal record is so cursory, and at points so materially incomplete, that I cannot link her adverse credibility determination to the evidence she specifically discussed. *Cf. Monroe*, 826 F.3d at 189 (explaining that it is not enough for the ALJ to "cite[] evidence that he appeared to believe tended to discredit" the claimant's testimony describing specific impairment-related symptoms or limitations if he then fails "to build an accurate and logical bridge from the evidence to his conclusion that [this] testimony was not credible." (quotation marks omitted)).

The Commissioner responds that J.D.W.'s "impairments did not impose limitations remotely close to the severity of any examples of functional equivalence" in 20 C.F.R. § 416.926a(m), such as the "complete inability to function independently outside the area of one's home within age appropriate norms." Def.'s Br. 5 (quoting 20 C.F.R. § 416.926a(m)(4)). Perhaps a properly supported discussion of the entire record could support the Commissioner's

---

[6] Contrary to the Commissioner's suggestion, it is not enough for the ALJ to "identif[y] substantial evidence" supporting her overall conclusion that J.D.W. had less than marked limitations. Def.'s Br. 7; *see id.* at 8–10, 13–14 (recounting the ALJ's underlying factual findings and asserting that the cited exhibits provide sufficient support for the ALJ's determination that Elsie L.'s subjective statements were "not entirely credible" and her conclusion that J.D.W.'s autism caused at most "less than marked" limitations). "This Court cannot meaningfully review the Commissioner's denial of benefits unless the ALJ's written decision 'explicitly indicates the weight given to all of the relevant evidence' and contains an adequate explanation of the findings and conclusions drawn therefrom." *Ricky C. v. Soc. Sec. Admin.*, No. 4:17cv20, 2018 WL 3567288, at *4 (W.D. Va. June 22, 2018) (quoting *Gordon*, 735 F.2d at 235–36), *adopted by* 2018 WL 35551530 (W.D. Va. July 24, 2018) (Kiser, J.). The ALJ does not need to discuss every piece of relevant evidence, but she "must evaluate the record fairly," *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003) (per curiam), and provide enough "analysis of the evidence to allow the [reviewing] court to trace the path of [her] reasoning," *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995). *See Lewis*, 858 F.3d at 869; *Mascio*, 780 F.3d at 636–38; *Hines*, 453 F.3d at 566 (citing *Diaz*, 55 F.3d at 307). ALJ Munday's written decision does not satisfy these minimum standards. *See Lewis*, 858 F.3d at 868 ("The ALJ's failure to build an accurate and logical bridge from the evidence to his conclusion constitutes reversible error."). Moreover, Fourth Circuit "precedent makes clear that it is not [the court's] role . . . to hypothesize the ALJ's justifications that would perhaps find support in the record." *Fox v. Colvin*, 632 F. App'x 750, 755 (4th Cir. 2015) (per curiam) (citing *Mascio*, 780 F.3d at 638; *Radford*, 734 F.3d at 296). Accordingly, I will not "engage[] in an analysis that the ALJ should have done in the first instance." *Id.*; *see also Brown v. Colvin*, 639 F. App'x 921, 923 (4th Cir. 2016) ("[W]e remand to avoid engaging in fact-finding 'in the first instance' and to allow the ALJ to further develop the record so that we can conduct a meaningful judicial review in the event the case returns to us." (quoting *Radford*, 734 F.3d at 296)).

assertion. But, the regulations make clear that the domains take into account *all aspects* of the child's functioning at home, at school, and in the community, and that the ALJ must consider *all relevant evidence* in the record when evaluating the severity of the child's impairment-related functional limitations. 20 C.F.R. § 416.926a; *see Drake v. Astrue*, No. 10-C-0420, 2011 U.S. Dist. LEXIS 105093, at *19 (E.D. Wis. Sept. 15, 2011) ("Mindful that the ALJ was not required to discus every piece of evidence, there is a need to discuss all relevant evidence creating a logical bridge to the result domain."). ALJ Munday's analysis of J.D.W.'s limitations in interacting and relating with others, in particular, focused almost exclusively on teachers' comments about the child's behavior at school without adequately weighing her mother's conflicting statements on that topic or considering other relevant evidence about her homelife and ability to function in the community.[7] Moreover, although the "extreme limitation" rating is reserved for "the worst limitations," it "does not necessarily mean" the child must demonstrate "a total lack or loss of ability to function" in a domain. 20 C.F.R. § 416.926a(e)(3). On the contrary, the child's "day-to-day functioning may be very seriously limited" when her medical impairment "limits only one activity" or "when the interactive and cumulative effects" of that impairment limit several activities within a domain. *Id.* The record in this case is not so one-sided that the ALJ's failure to properly analyze Elsie L.'s and J.D.W.'s subjective statements could be considered harmless error. *See Fox*, 632 F. App'x at 755 (reversing and remanding where "[i]nconsistent evidence abounds, and yet the ALJ 'leaves us to wonder' in such a way that we cannot conduct 'meaningful review'" (quoting *Mascio*, 780 F.3d at 638)); *Kersey v. Astrue*, 614 F. Supp. 2d 679, 697 (W.D. Va. 2009) ("Errors are harmless in social security cases

---

[7] For example, the ALJ did not mention Elsie L.'s report to healthcare providers that she did not take J.D.W. shopping with her because the child worried excessively and did not like crowds. R. 786; *see also* R. 958 ("[She] also refuses to leave the house, 'her comfort zone,' and will scream, yell."). Nor did she mention that at least two separate medical visits were cut short because J.D.W. was too anxious and repeatedly stated that she wanted to go home. R. 1001, 1020; *see also* R. 788.

when it is inconceivable that a different administrative conclusion would have been reached absent the error.").

Given the conflicting evidence in the record available to ALJ Munday, the Commissioner deserves another opportunity to adequately explain her findings and conclusion that J.D.W.'s autism did not functionally equal the listings. On remand, the Commissioner must consider and apply the applicable legal rules to all the relevant evidence in the record bearing on the credibility of Elsie L.'s and J.D.W.'s subjective complaints and alleged functional limitations, explain how any material inconsistencies or ambiguities in this evidence were resolved, and provide a logical link between the evidence she found credible and the findings and conclusions drawn therefrom.

## V. Conclusion

For the foregoing reasons, I respectfully recommend that the presiding District Judge **GRANT** Plaintiff's Motion for Summary Judgment, ECF No. 15, **DENY** the Commissioner's Motion for Summary Judgment, ECF No. 18, **REVERSE** the Commissioner's final decision, **REMAND** the matter for further administrative proceedings under the fourth sentence of 42 U.S.C. § 405(g), and **DISMISS** this case from the Court's active docket.

### **Notice to Parties**

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations

within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the Honorable Jackson L. Kiser, Senior United States District Judge.

The Clerk shall send certified copies of this Report and Recommendation to all counsel of record.

ENTER: December 4, 2018

Joel C. Hoppe
United States Magistrate Judge